**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**


| | | |
|---|---|---|
| IMPREGLON, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:05-CV-2563-RWS |
| NEWCO ENTERPRISES, INC., and | : | |
| W. CURT JARRELL, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## <u>ORDER</u>

This case comes before the Court for consideration of (i) Plaintiff's
Motion for Summary Judgment as to Liability for Breach of Fiduciary Duty
[40]; (ii) Plaintiff's Motion for Summary Judgment on Employment Contract
Restrictions on Count V of Its Complaint [41]; (iii) Plaintiff's Motion for
Summary Judgment as to Liability for Violation of the Lanham Act and the
Georgia Uniform Deceptive Trade Practices Act [42]; and (iv) Defendants'
Motions for Summary Judgment [60, 61, 62].  After considering the entire
record, the Court enters the following Order.

**Background**

## I.    The Parties

Plaintiff Impreglon, Inc. is a Georgia corporation which engages

primarily in the business of applying surface coatings to metal and other

substances.  (Pl.'s Stmt. of Mat. Facts [41-1] ¶¶ 1-2 [hereinafter "PSMF-B"].)[1]

Impreglon's business generally consists of receiving products or parts from

customers, applying a specified coating or combination of coatings to the

surfaces of the parts or products in order to achieve a desired property, such as

---

[1] Plaintiff, in what the Court would hardly characterize as a best practice, has elected to file three separate Motions for Summary Judgment on different claims.  (See Dkt. Nos. [40, 41, 42].)  These motions were filed on the same day, and each seeks summary judgment only on the issue of liability.  This Court has discretion to require parties to present their arguments in a single motion for summary judgment, see Allstate Fin. Corp. v. Zimmerman, 296 F.2d 797, 799 (5th Cir. 1961) (explaining that "[w]hile we certainly do not approve in general the piecemeal consideration of successive motions for summary judgment, since defendants might well normally be held to the requirement that they present their strongest case for summary judgment when the matter is first raised," district courts have discretion to consider successive motions for summary judgment), and the Court sees no reason why these three separate motions could not have been consolidated.  Moreover, proceeding in this manner has, aside from resulting in a de facto grant of leave to file excess pages (see L.R. 7.1(D), NDGa. ("Absent prior permission of the court, briefs filed in support of a motion or in response to a motion are limited in length to twenty-five (25) pages."), necessitated not only the filing of three separate response and reply briefs, but also three separate statements of undisputed material facts, three separate responses to those statements, and three separate replies to those responses. (See Dkt. Nos. [40-1, 41-1, 42-1, 60, 61, 62, 70, 74, 75].)  This has resulted in a confusing array of factual statements, denials, and counter-statements which could have been easily avoided.

non-stick, abrasion resistance, or corrosion protection, and then returning the coated parts or products to the customer.  (Id.; Pl.'s Stmt. of Mat. Facts [42-2] ¶ 1 [hereinafter "PSMF-C"]; Verified Compl. [1] ¶ 6.)  Defendant Newco Enterprises, Inc. ("Newco") is a Georgia corporation which engages primarily in the business of refurbishing and repairing hot melt adhesive application equipment for use in the non-woven industry.[2]  (PSMF-B ¶¶ 17-18.)  Newco was previously a significant customer of Impreglon, however, it now performs coating services and competes with Impreglon in the coating services market. (See id. ¶¶ 4, 20-21, 48.)  Defendant W. Curt Jarrell is the former President and CEO of Impreglon, and is currently an employee of Newco, and a member of the "Newco Trust," a three-person management group which makes all business decisions for Newco.  (See id. ¶¶ 8, 43.)

## II.     The Relationship Between Impreglon, Newco, and Jarrell

In March of 1994, Jarrell was hired as the President and CEO of Impreglon for a period of three years.  (PSMF-B ¶ 8.)  In addition, Jarrell was granted an option to purchase up to a 55% majority ownership interest in

---

[2] The non-woven industry manufactures diapers and feminine hygiene products out of non-woven materials.  (PSMF-C ¶ 11.)

AO 72A
(Rev.8/82)

Impreglon, which Jarrell did not exercise.[3]  (<u>Id.</u> ¶ 9.)  After serving as
Impreglon's President and CEO for approximately three years, Jarrell and
Impreglon, on or about February 18, 1997, entered into a new employment
agreement (the "1997 Agreement").  Under the terms of the 1997 Agreement,
Jarrell was to continue in his capacity as President and CEO until Impreglon's
"close of business," or Jarrell's "death" or "total disability" (<u>id.</u> ¶ 11), but could
resign his position at any time after providing sixty days prior written notice.
(Jarrell Depo. Ex. 4, 1997 Agreement ¶ 11.)  As pertinent to this action, the
1997 Agreement contained a number of restrictive covenants, including (1) a
non-compete clause, (2) a non-solicitation clause, and (3) a restriction on
soliciting and/or hiring other Impreglon employees to work in a competing
enterprise.  (PSMF-B ¶ 13.)

In the fall of 1998, Impreglon, along with all of the companies licensed to
sell coating services under the Impreglon trade name worldwide, adopted a
uniform, alpha-numeric system to identify each of the various coatings offered
by the companies.  In the same year, Newco, in conjunction with its primary

---

[3] The option was for six years, and expired on March 1, 2000.  (PSMF-B ¶ 9.)
Although Jarrell did not exercise his option, he did ultimately acquire 2,737 shares of
Impreglon stock in July of that year.  (<u>Id.</u> ¶ 10.)

business, began to offer coating services to its customers.  Lacking the capacity

to perform the coating services itself, Newco outsourced all of its coating needs

to Impreglon.[4]  (PSMF-C ¶ 13.)  During this period, Newco was authorized to

use the Impreglon coating numbers in its communications with its customers to

refer to the various coatings available from Impreglon through Newco.  Under

this arrangement, Newco would prepare promotional coating samples for

customers by applying an adhesive label with Newco's name, address, contact

information, and the appropriate Impreglon coating number to coating samples

provided by Impreglon for that purpose.  (Id. ¶¶ 14, 17.)  In addition, Newco

would provide customers with technical data sheets relating to the various

coatings available.  These data sheets were provided by Impreglon, and Newco

would then substitute its own name, address, and contact information, for that

of Impreglon.  (Id. ¶ 18.)  Newco provided both the coating samples and the

technical data sheets bearing its own contact information with Impreglon's full

knowledge and consent.

---

[4] During the period leading up to this litigation, Newco was a major customer of
Impreglon, and the two companies maintained a close business relationship.  In 2001,
Newco relocated to land purchased from Impreglon and across the street from its facilities
to reduce its transportation and shipping costs.  (PSMF-B ¶ 24.)  In 2004, Newco
accounted for 22% of Impreglon's sales.  (Id. ¶ 15.)

From 1998 to 2005, Newco continued to outsource its coating needs to Impreglon in this manner.  (PSFM-B ¶ 25.)  During this period, Jarrell served as Newco's primary contact with Impreglon, he attended trade shows with and for Newco, and answered technical coating questions from both Newco and its customers.  (Id. ¶ 23.)

By late 2004, while still employed as the President and CEO of Impreglon, Jarrell began considering resignation, and in November or December of 2004, engaged in numerous discussions with Newco regarding the possibility of joining Newco as its president and a shareholder.  (Id. ¶¶ 26-27.)  For reasons not in the record, this did not at first come to fruition, and Jarrell initially elected instead to start his own coating business, Fusion Surface Engineering, Inc. ("FSE").  (See id. ¶¶ 29-31.)  In January 2005, Jarrell entered into negotiations with Newco to lease a Newco building for purposes of housing his FSE's business operations.  (Id. ¶ 32.)  In addition, Jarrell requested, and received, a written commitment from Newco to send its coating business, which it had previously outsourced to Impreglon, to FSE.  (Id. ¶ 33.)  By letter dated February 2, 2005, Newco agreed to use FSE for its coating operations, and provided Jarrell with specific estimates, based on its previous

6

dealings with Impreglon, of the value of the coating work that FSE could expect to receive.  (Id.)

In February 2005, plans changed again.  Rather than outsourcing its coating services to Jarrell's new company, it was decided that Jarrell would go to work directly for Newco, and Newco developed a two-year business plan which shows Newco providing coating services in-house and not through a separate, Jarrell-owned entity. (Id. ¶ 34.)  Shortly thereafter, Newco's president informed at least one Newco employee that Jarrell was coming to Newco as a "partner," but that the employee should "keep it quiet."  (Id.)  In February or early March 2005, and in preparation for Jarrell's arrival, Newco began to reconfigure its manufacturing facilities to perform coating services, devoting 50% of the reconfigured space to coating services and installing new equipment including coating booths, a large oven, compressors, and a spray gun. (Id. ¶¶ 37-39.)  Some of this equipment, including a plasma coating booth, a wet coating booth, and a blast booth, were purchased by Jarrell during the period of his employment with Impreglon.  (See id. ¶ 39.)  In the end, while still an officer of Impreglon, Jarrell would either invest in, or loan, Newco $125,000

7

worth of coating equipment in return for a 35% ownership interest in Newco. (Id. ¶¶ 41-42.)

On or about March 15, 2005, Jarrell sent a letter to Henning Claassen, stating his intent to resign his position as President and CEO of Impreglon. (See id. ¶ 14.)  Mr. Claassen accepted Jarrell's resignation, expressly referencing the provision of the 1997 Agreement which required Jarrell to provide 60 days advance notice of his resignation.[5]  (Id.)  At the request of Mr. Claassen, however, Jarrell agreed to remain with Impreglon beyond the required 60 day period and continued to serve in his capacity as President and a CEO of Impreglon until June 10, 2005.  (See id. ¶¶ 14-15.)  On July 5, 2005, Jarrell would officially start work with Newco.

In June 2005, Newco stopped outsourcing the entirety of its coating work to Impreglon, and began providing some polymer and thermal coating services itself.  (PSMF-C ¶ 19.)  These were the same types of services which were previously provided by Impreglon.  (Id. ¶ 21.)  Newco lacked the capacity to

---

[5] The 1997 Agreement provided that Jarrell "may terminate his employment with [Impreglon] at any time upon sixty (60) days prior written notice," and that, with the exception of the restrictive covenants, all obligations between the parties under the Agreement shall cease except "[u]pon termination of employment initiated by [Jarrell]." (1997 Agreement Ex. 4 ¶ 11.)

perform certain coating work for its customers, however, and thus continued to outsource some portion of its coating work to Impreglon.  This relationship continued until August 2005, when Impreglon informed Newco that it would no longer provide Newco with such services.  (Defs.' Stmt. of Mat. Facts [62] ¶¶ 19, 21 [hereinafter "DSMF-C"].)  Although Newco still lacks the capacity to perform certain coating services, it now competes with Impreglon in the marketplace.  (PSFM-C ¶ 29; DSMF-C ¶ 29.)

In October 2005, Plaintiff initiated this action alleging, <u>inter alia</u>, that Jarrell and Newco's actions violate the Lanham act, 15 U.S.C. § 1125(a), the Georgia Unfair Trade Practices Act, O.C.G.A. § 10-1-370 <u>et seq</u>., the Georgia Trade Secrets Act of 1990, O.C.G.A. §10-1-761(2) <u>et seq</u>., and that Jarrell individually breached both the 1997 Agreement and his fiduciary obligations to Impreglon.  Plaintiff then moved for preliminary injunctive relief which this Court, by order entered October 13, 2005 granted in part and denied in part.  (<u>See</u> Order of Oct. 13, 2005 [8].)  Discovery has been concluded, and both Plaintiff and Defendants now move for summary judgment.  The Court turns to resolve these motions.

**Discussion**

## I.      Preliminary Matters

Before turning to the merits of Plaintiff's various motions for summary

judgment, one preliminary matter warrants attention.  Under the Local Rules of

this Court, as well as the Scheduling Order governing this case, all motions for

summary judgment must be filed not later than 20 days after the close of

discovery.  L.R. 56.1(D), NDGa. ("Motions for summary judgment shall be

filed as soon as possible, but, unless otherwise ordered by the court, not later

than twenty (20) days after the close of discovery. . . ."); Scheduling Order [15]

(same).  Discovery in this case closed on July 31, 2006.  Accordingly, any

motion for summary judgment was required to be filed not later than 20 days

after that date.  Plaintiff timely moved for summary judgment; Defendants did

not.  Instead, Defendants elected to incorporate their own motions for summary

judgment into their responses to Plaintiff's timely filed motions.  These

responses were filed on September 19, 2006, approximately a month after the

deadline for filing summary judgment motions expired.[6]  Defendants have not

---

[6] The Court previously denied Defendants' express request for an extension of time to file any motions for summary judgment.  (<u>See</u> Order of Nov. 14, 2006 [83].)

AO 72A
(Rev.8/82)

provided any legitimate justification for this failing, much less one that rises to the level of *excusable* neglect.  <u>See</u> Fed. R. Civ. P. 6(b)(2).  Indeed, Defendants' only proffered explanation is that it "served judicial efficiency and the quick and efficient disposition of the case to combine the Defendants' Motion for Summary Judgment with its Response to Plaintiff's Motion for Summary Judgment."  (Reply in Supp. of Defs.' Mot. for Summ. J. [79] at 2.)  As a general matter, nothing prohibits a party from combining filings, and the Court recognizes that in certain instances doing so may indeed enhance judicial efficiency.  But, regardless of whether this is true generally, Defendants' argument does not change the fact that in this case their motions for summary judgment were untimely.  Thus, while proceeding in this manner was perhaps expedient for defense counsel, and while defense counsel may have perceived it to be advantageous in that, if permitted, Defendants would be given an additional opportunity to place their arguments before the Court, the Court disagrees that Defendants' untimely motions enhance judicial efficiency.  To the contrary, it is the Court's view that judicial efficiency is better served by the timely filing of motions in compliance with this Court's  Local Rules and Scheduling Orders.  Accordingly, the Court declines to consider Defendant's

Motions for Summary Judgment [60, 61, 62], and as such, those Motions are

**DENIED**.[7]

## II.       Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment

shall be granted "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." FED. R. CIV. P. 56(c).  "The moving party bears

'the initial responsibility of informing the . . . court of the basis for its motion,

and identifying those portions of the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,

which it believes demonstrate the absence of a genuine issue of material fact.' "

---

[7] In view of the Court's disposition of Defendants' Motions for Summary Judgment, it similarly declines to consider Defendants' Reply briefs filed in support of those motions.  Insofar as those briefs relate directly to Defendants' Motions for Summary Judgment, those motions have already been denied.  To the extent that they relate to matters raised in Plaintiff's Motions for Summary Judgment, they constitute improper surreplies which are not contemplated by the Local Rules and which require that leave of court be obtained prior to their filing.  See L.R. 56.1(A), NDGa. ("In accordance with LR 7.1C, the parties shall not be permitted to file supplemental briefs and materials, with the exception of a reply by the movant, except upon order of the court."); Elliott v. Am. Intern. Life Assur. Co. of New York, 394 F. Supp. 2d 1357, 1362 (N.D. Ga. 2005).

AO 72A
(Rev.8/82)

Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (internal quotations omitted)).  Where the moving party makes such a showing, the burden then shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  The applicable substantive law identifies which facts are material.  Id. at 248.  A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. Id.  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Id. at 249-50.

       In determining a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002).  But, the court is bound only to draw those inferences which are reasonable.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita

13

Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(c), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

### III.     Breach of Fiduciary Duty

In its Motion for Summary Judgment, Plaintiff points to a number of actions by which it contends Jarrell breached his fiduciary duty to Plaintiff.  For instance, Impreglon contends that Jarrell improperly (1) usurped an Impreglon corporate opportunity by forming his own coating company to perform coating work previously performed by Impreglon (see Br. in Supp. of Mot. for Summ. J. at 11-14), (2) solicited customers for a competing company (id. at 14-16), (3) transferred equipment from Impreglon to Newco (see id. at 15-16), and (4) solicited and enticed Impreglon employees to leave Impreglon in favor of employment with Newco (see id. at 16).  Defendant, in his perfunctory Response, which consists of a mere thirteen lines of substantive text and one

14

case citation, argues that summary judgment is inappropriate for two reasons. First, Defendant contends that the actions about which Plaintiff complains constitute mere planning to enter a competing business, which, under Georgia law, does not violate his fiduciary duty.  (<u>See</u> Defs.' Resp. in Opp'n to Mot. for Summ. J. at 3-4.)  Second, Defendant argues that, to the extent certain actions may, if proven, constitute a breach of fiduciary duty, questions of fact exist which preclude summary judgment.  For the reasons that follow, the Court disagrees with Defendant and finds summary judgment appropriate.

" 'It is well settled that corporate officers and directors have a fiduciary relationship to the corporation and its shareholders and must act in good faith.' " <u>Argentum Intern., LLC v. Woods</u>, 634 S.E.2d 195, 202 (Ga. Ct. App. 2006) (quoting <u>Paul v. Destito</u>, 550 S.E.2d 739 (Ga. Ct. App. 2001)); <u>see also</u> <u>Insight Technology, Inc. v. FreightCheck, LLC</u>, 633 S.E.2d 373, 377 (Ga. Ct. App. 2006) (stating that it has previously recognized "the black letter law that corporate officers and directors occupy a fiduciary relationship to the corporation and its shareholders, and are held to the standard of utmost good faith and loyalty." (internal quotations omitted)).  As Defendant correctly points out, however, fiduciary obligations do not serve as an absolute bar to

15

competition between an officer and a corporation, and a corporate officer does
not breach his fiduciary duty to the corporation merely by making plans to enter
a competing business while he is still employed.  E.g., Gresham & Associates,
Inc. v. Strianese, 595 S.E.2d 82, 84 (Ga. Ct. App. 2004); Bob Davidson &
Assocs., Inc. v. Norm Webster & Assocs., Inc., 553 S.E.2d 365, 370 (Ga. Ct.
App. 2001); E.D. Lacey Mills, Inc.v. Keith, 359 S.E.2d 148, 155 (Ga. Ct. App.
1987).  But, there are limits on what an officer may do in furtherance of his
competitive plan while employed by the corporation.  For example, a corporate
officer is prohibited from appropriating the business opportunities of the
corporation.  See, e.g., Southeast Consultants v. McCrary Engineering Corp.,
273 S.E.2d 112, 116-17 (Ga. 1980).  Similarly, while it is true that "an
employee may make plans to compete with his employer while still employed,
'[h]e is not . . . entitled to solicit customers for [a] rival business before the end
of his employment nor can he properly do other similar acts in direct
competition with the employer's business.' "  Keith, 359 S.E.2d at 155 (quoting
Restatement (Second) of Agency § 393).

    In this case, it is undisputed that Jarrell served as the President and CEO
of Impreglon from 1994 through June 10, 2005.  It is also undisputed that

during his employment with Impreglon, Jarrell planned extensively to engage in a competing enterprise.  Jarrell and Newco engaged in extensive discussions regarding his future employment by, or association with, Newco; he incorporated Fusion Surface Engineering with the knowledge that his new company would, at some point, compete with Impreglon; and he provided upwards of $100,000 in equipment to Newco in order to establish its own, in-house coating operation.  Additionally, it is undisputed that during this period, Jarrell attempted on at least two occasions to secure coating business which had previously been performed by Impreglon.  First, as explained above, Jarrell sought, and received, written assurances from Newco that his company, instead of Impreglon, would receive Newco's coating business upon his separation from Impreglon.  Second, in the Spring of 2005, Jarrell and Newco representatives traveled to Wisconsin to meet with executives of Curt Joa, Inc.—a significant Newco client which was aware that Newco outsourced its coating services to Impreglon and which had developed a positive, direct relationship with Impreglon through Jarrell.  During this meeting, the Curt Joa officials were advised that Jarrell intended to leave Impreglon's employ, and that he would be joining (or at least affiliated with) Newco.  The purpose of this

17

trip was two-fold: first, they sought to persuade Curt Joa to continue its relationship with Newco, and to allow Newco (either directly or through FSE), rather than Impreglon, to perform its coating services; second, they sought to reassure Curt Joa that the coatings provided by Newco would be applied under Jarrell's direction and supervision, and thus, would be substantially identical to those provided by Impreglon.

With respect to Jarrell's extensive negotiations with Newco regarding his employment, his incorporation of FSE and discussion of potential lease options, and his contributions of equipment and other resources to Newco, the Court concludes that these do not rise to the level of a breach of fiduciary duty. Certainly, these actions fall far short of the ideal of fidelity to one's employer. Nevertheless, under Georgia law they constitute mere preparation for competition and thus, do not run afoul of Jarrell's legal obligations to Impreglon.  See, e.g., Gresham & Associates, 595 S.E.2d at 84 (explaining that an officer remains free to make arrangements to compete, and can even properly purchase a rival business so that he may, upon termination of his employment, immediately compete with his former employer).

18

Jarrell's attempts to secure the business of current Impreglon customers are far more problematic.  While the contacts with Impreglon's customers do not violate Jarrell's obligation to refrain from appropriating the business opportunities of the corporation,[8] they do transgress the well-established

---

[8] A corporation may sue an officer or director for "[t]he appropriation, in violation of his duties, of any business opportunity of the corporation."  O.C.G.A. § 14-2-831(a)(1)(C).  Georgia courts employ a two-step process for determining whether liability for the wrongful appropriation of a business opportunity should be imposed.  See S.E. Consultants v. McCrary Engineering Corp., 273 S.E.2d 112 (Ga. 1980).  "First, a court must determine whether the appropriated opportunity was in fact a business opportunity rightfully belonging to the corporation.  If a court finds that the business opportunity was not a corporate opportunity, the directors or officers who pursued the opportunity for personal benefit are immune from liability." Mau, Inc. v. Human Techs., Inc., 619 S.E.2d 394, 397 (Ga. Ct. App. 2005).  " 'A business opportunity arises from a "beachhead" consisting of a legal or equitable interest or an "expectancy" growing out of a pre-existing right or relationship.' " Id. (quoting United Seal & Rubber Co. v. Bunting, 285 S.E.2d 721 (Ga. 1982)).  In the absence of any contractual or other exclusive arrangement between a company and its customers, and where the relationship between the company and its customers is an ongoing one with no finite aspect, the bare opportunity to deal with those customers in the future does not constitute a corporate opportunity.  See Singer v. Habif, Arogeti & Wynne, P.C., 297 S.E.2d 473, 476 (Ga. 1982); United Seal, 285 S.E.2d at 723; see also Mau, 619 S.E.2d at 396 (discussing United Seal holding, and stating that court found no corporate opportunity even though "the company had dealings of long standing with the customers, whose sales accounted for a large portion of its income" because "the customers had no exclusive arrangement with the company; and the opportunity suggested was an ongoing [one] with no finite aspect." (internal quotations omitted)).

In this case, it is undisputed that there was never any contractual relationship between Impreglon and either Newco or Curt Joa.  Moreover, the relationship between the entities appears to be an ongoing one with no finite aspect.  Impreglon's right to deal with these customers, therefore, does not constitute a corporate opportunity under Georgia law.  As such, Jarrell cannot be held liable for his contact with these customers under a "corporate opportunity" theory.

19

prohibition against the solicitation of customers by current corporate officers and fiduciaries.  See, e.g., Keith, 359 S.E.2d at 155 (explaining that a corporate officer "is not . . . entitled to solicit customers for a rival business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's business.").  Jarrell actively solicited Impreglon's customers while he was employed as its President and CEO.  He obtained written assurances from Newco that his company, rather than his current employer, would receive Newco's coating business upon his separation from Impreglon.  These assurances were specific, and were supported by estimates of the value of this business based upon Impreglon's previous dealings with Newco.  Contrast Nilan's Alley, Inc. v. Ginsburg, 430 S.E.2d 368, 369 (Ga. Ct. App. 1993) (refusing to find impermissible customer solicitation where salesman merely inquired of customers whether, if he were to leave his current employment, they would consider placing orders through him, and the conversations were brief, nonspecific, and strictly hypothetical).  In addition, he accompanied Newco officials to Wisconsin in a targeted effort to ensure that a significant source of Impreglon's coating business would follow

20

him upon his separation from Impreglon.[9]  Without question, Jarrell's contacts

with current Impreglon customers in a direct and concerted effort to secure their

future business for a rival company, occurring as they did during Jarrell's

employment as Impreglon's President and CEO, violated his obligation to

Impreglon to act with the "utmost good faith and loyalty."  Insight Technology,

633 S.E.2d at 377.  Because it is undisputed that these customer contacts

occurred during his employment with Impreglon, these actions constitute a

breach of Jarrell's fiduciary duty as a matter of law.  Accordingly, summary

judgment in favor of Plaintiff on the issue of liability is warranted, and

Plaintiff's Motion for Summary Judgment is **GRANTED**.[10, 11]

---

[9] The Court does not deem it significant that Curt Joa did not have a direct relationship with Impreglon, but rather utilized Impreglon's services indirectly through Newco.  It is undisputed that Curt Joa was aware that Impreglon, and not Newco, actually provided its coating services, and that Curt Joa was satisfied with the products and services Impreglon offered.  Indeed, the express purpose of this trip was, in essence, to convince Curt Joa to discontinue its use of Impreglon's coating services in favor of those provided directly by Newco and Jarrell.

[10] Plaintiff additionally alleges that Jarrell breached his fiduciary duty by either transferring equipment to Newco, or encouraging and/or soliciting current Impreglon employees to leave en masse for employment with Newco.  With respect to the transfer of equipment, it appears that certain equipment was fabricated at the Impreglon facilities by Jarrell's father, paid for with Impreglon funds, and delivered to Newco.  It is Jarrell's position, and the Court assumes this to be the case for purposes of Plaintiff's Motion for Summary Judgment, that he was unaware that his father had engaged in this conduct, and upon learning of it, ordered him to immediately cease and reimburse Impreglon for any

AO 72A
(Rev.8/82)

## IV.    Breach of Employment Contract

Plaintiff Impreglon was incorporated in December of 1993, and began business in March of 1994.  Pursuant to a 1994 Employment Contract, on March 4, 1994, Jarrell was hired as the company's first employee and officer.  Shortly thereafter, Jarrell was granted a six-year option to purchase up to a 55% ownership interest in Impreglon.  During the period of his employment, Jarrell did not exercise this option.  Jarrell did, however, eventually acquire 2,737 shares of Impreglon stock, which was subsequently repurchased by Impreglon just prior to his separation from the company.

In February 1997, Plaintiff and Defendant entered into a new Employment Agreement.  The 1997 Agreement contains several restrictive

---

charges.  (Jarrell Aff. ¶ 14.)  As such, a genuine issue of material fact exists.  Regarding Jarrell's alleged "pirating" of Impreglon employees, the Court similarly concludes that, for the reasons stated in Part IV, a genuine issue of fact exists.  Accordingly, insofar as Plaintiff moves on these grounds, that motion is **DENIED**.

[11] In its Motion for Summary Judgment, Plaintiff requests that the Court permanently enjoin Jarrell from engaging in competition with Impreglon based upon his breach of his fiduciary obligations.  In this Order, the Court determines only that in soliciting Impreglon's customers, Jarrell breached his fiduciary obligations to Plaintiff as a matter of law.  The Court expresses no opinion on the issue of whether, based upon this customer solicitation, the permanent injunctive relief Plaintiff seeks is warranted.

covenants which are at issue in this case.  Specifically, the Agreement, which

contains both a non-competition clause and a non-solicitation clause, provides:

> (a) <u>Restrictions on Working for Competition</u>
> Employee agrees that during his employment by the
> Corporation and for a period of two (2) years
> following the termination of employment for any
> reason whatsoever, he will not accept (except on
> behalf of or with the prior written consent of the
> Corporation) within the territorial United States (the
> "Area"), either directly or indirectly, on his own
> behalf or in the service or on behalf of others own,
> manage, operate, control or serve as Chief Executive
> or Operating Officer which is engaged in the same
> business, or essentially the same business, as that of
> the Corporation. to Employee a knowledge is an
> agrees that the Corporation does business and intents
> [sic] to do business on a national basis, and for such
> reason, this provision is agreed to be reasonable.  If
> the Employee is discharged for cause, . . .  the
> Corporation will either pay a lump-sum compensation
> of $80,000 were waived a non-compete clause.

> (b) <u>Restrictions on Hiring Employees and Customers</u>
> i) The Employee agrees that during his employment
> by the Corporation and for a period of two (2) years
> following the termination of employment for any
> reason whatsoever, he will not, either directly or
> indirectly, on his own behalf, or in the service or on
> behalf of others, solicit, divert, or entice, or attempt to
> solicit, divert, or entice, to any business involved in
> the same or essentially the same business as the
> Corporation, any person employed by the Corporation
> in the Area, whether or not such employee is a full-

23

> time employee or temporary employee of the
> Corporation, or any customer, person or entity whose
> account with the Corporation was sold and serviced
> by or under the direct supervision of Employee, and
> during the last two (2) years of this employment by
> the Corporation.

(1997 Agreement ¶ 5, Jarrell Depo. Ex. 4.)

Plaintiff, in its Motion for Summary Judgment, argues that Jarrell

breached these covenants by (1) wrongfully directing Impreglon employees to

Newco, (2) soliciting Impreglon customers, (3) and otherwise assisting Newco

in providing coating services in competition with Impreglon. Based on these

alleged violations, Plaintiff requests that Jarrell be enjoined (1) from working in

any capacity for Newco, or, apparently in the alternative, from "providing or

assisting in the providing of any coating services to Newco or its customers . . .

and from dealing with Newco's customers or potential customers on any

coating issue"; (Br. in Supp. of Mot. for Summ. [41-2] at 20, 23), (2) "from

further pirating employees from Impreglon" (id.), and soliciting any customer

whose account was sold or serviced by or under Jarrell's direct supervision

during the last two years of his employment with Impreglon (id. at 20-23). For

24

the reasons that follow, the Court concludes that Plaintiff is not entitled to summary judgment.

### A.    Non-compete and Non-solicitation Agreements Under Georgia Law

Georgia courts have recognized three different situations in which employment-related restrictive covenants may arise, and apply three different levels of scrutiny to these restrictive covenants depending upon their contractual source.

> Restrictive covenants [which are] ancillary to the sale of a business traditionally have been afforded a substantial degree of protection by the Georgia courts and are viewed with the least degree of scrutiny. Conversely, covenants not to compete which are part of an employment contract receive close scrutiny to ensure that they are strictly limited in duration, territory, and prohibited activities. In between these two standards of review is the "middle level of scrutiny," which is generally applied to restrictive covenants ancillary to professional partnership agreements.

West Coast Cambridge, Inc. v. Rice, 584 S.E.2d 696, 697 (Ga. Ct. App. 2003).

Classifying the restrictive covenant as either ancillary to the sale of a business or to employment is the first step in determining whether that covenant is enforceable, Palmer & Cay, Inc. v. Marsh & McLennan Cos., 404 F.3d 1297,

1304 (11th Cir. 2005), and this classification may, in many instances, be

determinative of the covenant's enforceability.  Restrictive covenants which are

ancillary to the sale of a business are subject to a significantly lower level of

judicial scrutiny, and are enforceable to the extent that they are " 'found to be

essential to protect the purchaser of the business, despite the overbreadth of the

covenant.' " Id. at 1303 (quoting White v. Fletcher/Mayo/Assocs., Inc., 303

S.E.2d 746, 749 (Ga. 1983)).  Georgia courts reason that "these covenants form

part of the bargained-for exchange in the sale," and thus, should be entitled to

greater judicial deference to their terms.  See id. (quoting White, 303 S.E.2d at

749 ("The buyer pays and the seller receives a part of the total purchase price as

consideration for that covenant.  The buyer frequently would not buy the

business if the seller were free to begin competing immediately.")).  Courts may

therefore blue pencil—which is to say, sever or judicially modify—any

objectionable terms to bring them into compliance with Georgia law.  Id.   As a

result, the inclusion of any objectionable term in such an agreement does not

render the entire agreement unenforceable.  Id.

     In contrast, restrictive covenants ancillary to employment contracts are

subject to strict scrutiny.  "A restrictive covenant contained in an employment

contract is considered to be in partial restraint of trade and will be upheld 'if the

restraint imposed is not unreasonable, is founded on a valuable consideration,

and is reasonably necessary to protect the interest of the party in whose favor it

is imposed, and does not unduly prejudice the interests of the public.' " W.R.

Grace & Co., Dearborn Div. v. Mouyal, 422 S.E.2d 529, 531 (Ga. 1992)

(quoting Rakestraw v. Lanier, 30 S.E. 735, 738 (Ga. 1898)).  Such covenants

are enforceable only where they are " 'strictly limited in time and territorial

effect, and [are] otherwise reasonable considering the business interest of the

employer sought to be protected and the effect on the employee.' " Palmer &

Cay, 404 F.3d at 1303 (quoting White v. Fletcher/Mayo/Assocs., Inc., 303

S.E.2d 746, 748 (Ga. 1983)).  Additionally, such contracts may not be blue-

penciled to sever or modify any overreaching provisions.  Id.; Allied

Informatics, Inc. v. Yeruva, 554 S.E.2d 550, 553 (Ga. Ct. App. 2001).  Thus,

"[i]f any [restrictive] covenant . . . within a given employment contract is

unreasonable either in time, territory, or prohibited business activity, then all

covenants not to compete within the same employment contract are

unenforceable." Ward v. Process Control Corp., 277 S.E.2d 671, 673 (Ga.

1981).

27

**B.    Classification of the Covenants**

In this case, Plaintiff argues that the 1997 Agreement should be classified as ancillary to the sale of a business, and as a result, is subject to the lowest level of judicial scrutiny.  In support of this position, Plaintiff argues that because Jarrell was both an officer of Impreglon with "plenary management authority over Impreglon's complete business," and a minority shareholder who sold his ownership interest back to Impreglon upon his separation from the company, he was "more like an owner of the business than an employee," and thus, the Court should consider the covenants at issue to be ancillary to the sale of his ownership interest in the business.

The Court cannot concur with Plaintiff's assessment that the restrictive covenants in this case should be considered ancillary to the sale of a business. As an initial matter, Plaintiff's argument that the 1997 Agreement "is both an employment contract . . . and a contract for the sale Jarrell's ownership interest in Impreglon" is unavailing because that Agreement does not, despite Plaintiff's repeated statements to the contrary, relate in any way to the repurchase of Jarrell's interest in the company.  While Plaintiff states on multiple occasions that "the 1997 Employment Contract, at paragraph 21, requires the repurchase

28

of Jarrell's ownership interest in Impreglon," (Pl.'s Br. in Supp. at 9 (emphasis

removed); see also id. at 10 ("In this case, Jarrell sold his minority stock

ownership interest in Impreglon as part of his voluntary resignation under

paragraph 21 of the 1997 Employment Contract.")), the 1997 Agreement

contains no such provision.  Indeed, the 1997 Agreement does not even contain

a paragraph 21, or for that matter, any other paragraph relating to the repurchase

of Jarrell's ownership interest.[12]  Thus, it does not appear that Impreglon was, as

Plaintiff contends, "required" to repurchase his ownership interest in the

company, or that the restrictive covenants are, in any way, ancillary to an

agreement relating to the sale of an interest in Impreglon, minority or otherwise.

More importantly, however, there is no evidence that Jarrell entered into these

restrictive covenants in consideration for the sale of his interest in Impreglon.

That being the case, the entire rationale for applying reduced scrutiny to

covenants ancillary to the sale of a business is inapplicable.

_____

[12] While the First Amendment to Jarrell's 1994 Employment Agreement provides
that "in the event [Jarrell's] employment with the Corporation is terminated for any
reason, . . . the Corporation shall have the absolute right, but not the obligation, to
repurchase all or any portion of [Jarrell's] shares of stock in the Corporation," the 1997
Agreement, which superceded that agreement, contains no such provision.

Finally, Plaintiff argues that in determining the level of scrutiny to apply, the Court should look not to the context in which the restrictive covenants arose, but to Jarrell's level of responsibility and importance to Impreglon, as well as his comparative bargaining power in negotiating the covenants at issue. (See Pl.'s Reply in Supp. of Mot. for Summ. J. [76] at 3-4 ("The significance of Jarrell's position at Impreglon as president and chief executive officer, his minority stock ownership, [and] his option to take control of Impreglon, affect his bargaining power at the time [of] the execution of the 1997 Employment Contract which determines the level of judicial scrutiny this court applies to the restrictions before it."); id. at 5 ("Jarrell's contention that he was a 'mere employee' with little or no bargaining power does not pass the 'red face' test of reality. . . .  He had the power to control Impreglon at his sole option and choice.  The court should, accordingly, apply the least level of judicial scrutiny to the covenants before it.").  This precise argument has been expressly rejected by the Eleventh Circuit Court of Appeals.  In Palmer & Cay, the Circuit Court stated:

> [Marsh & McLennan] argues that an employee's level
> of responsibility or management within a company
> determines the level of scrutiny to be applied to any

> non-competition or non-solicitation agreement he
> executes, and that we should not apply strict scrutiny
> to restrictive covenants binding a corporation's
> upper-level managers or shareholders.  According to
> this argument, if we had sufficient facts to determine
> that Meathe exercised bargaining power with respect
> to the 2002 Agreement, we would apply lessened
> scrutiny even if it had no connection to the sale of a
> business. Because Georgia law, as enunciated by the
> Georgia Supreme Court, still instructs us to apply
> strict scrutiny to agreements ancillary to employment,
> see White, 303 S.E.2d at 749; Redmond, 261 S.E.2d
> at 588, we decline to extend Georgia law to apply
> intermediate or lessened scrutiny to the 2002
> Agreement.

404 F.3d at 1306 n.14.  Accordingly, to the extent Plaintiff makes this

argument, it is expressly foreclosed.

In sum, the restrictive covenants at issue were entered into in a contract

for employment, and they commenced with the termination of his employment

with the company.[13]  The contract does not, in any way, relate to the sale of his

ownership interest in the company, and there is no indication that the covenants

were entered into in consideration for the repurchase of his ownership interest.

---

[13] "[T]he Georgia Supreme Court has noted in dicta that a non-competition period
that starts with the termination of employment 'is customary in cases of noncompetitive
covenants ancillary to an employment contract.' " Palmer & Cay, 404 F.3d at 1306
(quoting Ins. Ctr., Inc. v. Hamilton, 602, 129 S.E.2d 801, 805 (1963)).

AO 72A
(Rev.8/82)

On these facts, the Court concludes that, notwithstanding Jarrell's clear importance to Impreglon and his relative bargaining power, the restrictive covenants must be classified as ancillary to employment, and thus, are subject to strict scrutiny.

### C.    Plaintiff is not Entitled to Summary Judgment

Having concluded that the restrictive covenants are subject to strict judicial scrutiny, the Court turns now to the question of their enforceability. Plaintiff argues that notwithstanding the classification of the covenants as ancillary to employment, they are nonetheless enforceable under Georgia law.

> Whether the restraint imposed by the employment contract is reasonable is a question of law for determination by the court, which considers the nature and extent of the trade or business, the situation of the parties, and all the other circumstances.  A three-element test of duration, territorial coverage, and scope of activity has evolved as a helpful tool in examining the reasonableness of the particular factual setting to which it is applied.

W.R. Grace, 422 S.E.2d at 531.

In his Response, Defendant does not appear to challenge either the duration or scope of the covenants.  Rather, Defendant appears to limit his

32

challenge to the geographic aspect of the restriction, arguing that because the 1997 Agreement forbids Jarrell from engaging in the same or substantially similar business throughout the territorial United States, the restriction is overly broad and should be declared unenforceable under Georgia law.

1. <u>The non-competition agreement</u>

The non-competition agreement in this case prohibits Jarrell from "engag[ing] in the same business, or essentially the same business, as that of the Corporation" anywhere "within the territorial United States" for a period of two years following his termination from Impreglon.  (1997 Agreement ¶ 5(a).) Plaintiff contends that this nationwide restriction is reasonable under the facts of this case because Impreglon is a "national business."

"A restriction relating to the area where the employee did business on behalf of the employer has been enforced as a legitimate protection of the employer's interest." <u>W.R. Grace</u>, 422 S.E.2d at 532.  But,

> [a] restriction relating to the area in which the
> employer does business is generally unenforceable
> due to overbreadth, unless the employer can show a
> legitimate business interest that will be protected by
> such an expansive geographic description.

AO 72A
(Rev.8/82)

W.R. Grace, 422 S.E.2d at 532.  Georgia courts "will not accept as prima facie valid a covenant related to the territory where the employer does business where the only justification is that the employer wants to avoid competition by the employee in that area."  Howard Schultz & Assocs. of the Southeast, Inc. v. Broniec, 236 S.E.2d 265, 268 (Ga. 1977).

First, there is the question of whether Impreglon actually engages in a nationwide business.  At most, Impreglon has made sales into 47 of the 50 states.  While its business activities clearly encompass much of the nation, 47 states is not "nationwide."  Moreover, Impreglon notes that two of the three states it has not done business in are Alaska and Hawaii, and implies that its ability to do business in those locations is limited, in part, by shipping costs. Thus, there is no indication that it plans to, or even could, engage in business in those states, or that if Jarrell were to establish or be employed by a coating business in either location, he would compete with Impreglon.  Second, even assuming that Impreglon engaged in a nationwide business, it is unclear from the record whether Jarrell himself did so on its behalf.  In light of these substantial uncertainties in the record, the Court concludes that summary judgment in Plaintiff's favor is not warranted.

34

Finally, beyond those reasons raised by Defendant, the Court notes that Plaintiff is not entitled to summary judgment on its claim for breach of the restrictive covenants for an additional reason—namely, that the covenant fails to specify with particularity the activities which Jarrell is prohibited from performing.

> A covenant not to compete is also unreasonable where the nature of the business activities in which the employee is forbidden to engage is not specified with particularity.  [Cits.]  These indefinite business activities generally are identified by reference to the employer's business; e.g., the employee agrees not to engage in or be employed by any "business similar to employer's business."

Howard Schultz, 236 S.E.2d at 267.

The non-competition agreement in this case expressly prohibits Jarrell from owning, managing, operating, controlling, or serving as the Chief Executive or Operating Officer of any entity "which is engaged in the same business, or essentially the same business as that of the Corporation."  Because the restrictive covenant  defines the prohibited activities by reference to Impreglon's business, it lacks sufficient particularity under Georgia law.  As

35

such, Plaintiff's motion for summary judgment, insofar as it relates to this provision, must be denied.

### 2.   The non-solicitation agreement

In view of the Court's conclusion regarding  the covenant not to compete, Plaintiff's Motion for Summary Judgment, insofar as it relates to its claim that Jarrell breached the nonsolicitation agreement, by necessity fails as well.  See Advance Technology Consultants, Inc. v. Roadtrac, LLC, 551 S.E.2d 735, 737-38 (Ga. Ct. App. 2001) (explaining that Georgia law is clear that if one of non-competition or non-solication covenant contained in an agreement  is unenforceable, then all others are similarly unenforceable.).

### 3.   The no-hire clause

In Paragraph 5(b) of the 1997 Agreement, Jarrell covenanted to refrain from either directly or indirectly soliciting, diverting, or enticing any person employed by Impreglon to any business involved in the same or essentially the same business.  Plaintiff is correct that its motion for summary judgment, to the extent it is predicated upon Jarrell's alleged breach of the no-hire clause, does not fail simply based upon the Court's determination regarding the non-

36

compete and non-solicitation agreements.  See Lane Co. v. Taylor, 330 S.E.2d 112, 116 (Ga. Ct. App. 1985).  Instead, it fails for a different reason.  Simply stated, Plaintiff has failed to demonstrate the absence of a genuine issue of fact as to whether Jarrell solicited, diverted, or enticed Impreglon employees to join Newco.  While it is undisputed that certain Impreglon employees did in fact leave Impreglon in favor of Newco, Jarrrell's precise role in those departures is in dispute.[14]  As such, Plaintiff is not entitled to summary judgment on this claim.

4.   Conclusion

Under Georgia law, covenants in partial restraint of trade are disfavored. Because it is not clear from the record that Impreglon engaged in a nationwide business, and because the covenant not to compete prohibits Jarrell from engaging in the same, or essentially the same business as Impreglon, the Court cannot conclude that it either is "strictly limited in . . . territorial effect" or that it identifies with sufficient particularity those activities which Jarrell is prohibited from undertaking.  As such, Plaintiff is not entitled to summary

---

[14] The Court expresses no opinion regarding whether the restrictions on soliciting and/or hiring Impreglon employees to work for any business involved in the same or essentially the same business as Impreglon is sufficiently particular.

judgment on this claim for breach of the covenant not to compete.  In view of that determination, Plaintiff's claim based upon Jarrell's breach of the non-solicitation agreement also fails.   Finally, a genuine issue of fact exists as to whether Jarrell breached the no-hire clause.  Accordingly, Plaintiff's Motion for Summary Judgment is **DENIED**.

## V.    Lanham Act and Georgia Deceptive Trade Practices Act

As explained above, Plaintiff adopted a uniform coating numbering system in 1998.  (PSMF-C ¶¶ 5-6.)  Under this system, each coating offered is identified by a specific alpha-numeric code, examples of which include: SC40230/2015F, SC40330/1013, SC40611/4002F, CeC40230, TCI.002F, TCIQQ6F, TC1013, TC1027, TC1017F, TC1501F, TC1501 METALLIC, TC1bO1F METALLIC, TC1507 RED, TC2008, TF2012, TC2016F, TC2503. (Verified Compl. [1], Ex. A.)  These coating numbers, which are unique to each coating Impreglon offers, provide direction as to specific ingredients and processes used in applying the particular coating.  (Id.)  While it is uncontested that Newco used these coating numbers with Impreglon's knowledge and permission for years, Plaintiff contends that Defendants' continued use of its coating numbers after it ceased providing coating services in August 2005

38

constitutes trademark infringement in violation of § 43(a) of the Lanham Act,

15 U.S.C. § 1125(a), and the Georgia Uniform Deceptive Trade Practices Act

("UDTPA"), O.C.G.A. §§ 10-1-370 et seq.  Specifically, Plaintiff argues that its

alpha-numeric coating numbers constitute protectable trademarks, and that

Defendants' unauthorized use of those coating numbers violates § 43(a) and

O.C.G.A. §§ 10-1-372(a)(2) & (12).  In addition, Plaintiff contends that

Defendants have used its coating numbers to label and sell non-Impreglon

coatings, and that these actions constitute impermissible "passing off" in

violation of § 43(a) and O.C.G.A. § 10-1-372(a)(1).  In its Motion for Summary

Judgment, Plaintiff requests that this Court enter judgment in its favor on the

issue of liability, leaving only the issue of damages for resolution at trial.  For

the reasons that follow, the Court declines Plaintiff's request.

### A.    Lanham Act claims

"Section 43(a) of the Lanham Act forbids unfair trade practices involving

infringement of trade dress, service marks, or trademarks, even in the absence

of federal trademark registration."[15]  Planetary Motion, Inc. v. Techsplosion,

---

[15] Section 43(a) of the Lanham Act provides in pertinent part:

(1) Any person who, on or in connection with any goods or

<u>Inc.</u>, 261 F.3d 1188, 1193 (2001).  "To prevail under this section, a claimant

must show (1) that it had prior rights to the mark at issue and (2) that the

defendant had adopted a mark or name that was the same, or confusingly

similar to its mark, such that consumers were likely to confuse the two."  <u>Id.</u>

 In order to establish rights in a mark protectable under § 1125(a), a

plaintiff must show that the mark is either inherently distinctive or has acquired

distinctiveness through secondary meaning.  <u>Montgomery v. Noga</u>, 168 F.3d

---

  services, or any container for goods, uses in commerce any
word, term, name, symbol, or device, or any combination
thereof, or any false designation of origin, false or
misleading description of fact, or false or misleading
representation of fact, which–

  (A) is likely to cause confusion, or to cause mistake, or to
deceive as to the affiliation, connection, or association of
such person with another person, or as to the origin,
sponsorship, or approval of his or her goods, services, or
commercial activities by another person, or

  (B) in commercial advertising or promotion, misrepresents
the nature, characteristics, qualities, or geographic origin of
his or her or another person's goods, services, or commercial
activities,

  shall be liable in a civil action by any person who believes
that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

1282, 1300 (11th Cir.1999) (citing <u>Two Pesos, Inc. v. Taco Cabana, Inc.</u>, 505 U.S. 763, 768-69, 112 S. Ct. 2753, 120 L. Ed. 2d 615 (1992)).  There are four categories of distinctiveness in which a mark may be classified: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful.  <u>Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.</u>, 931 F.2d 1519, 1522 (11th Cir. 1991); <u>see also</u> <u>American Television and Comm'cns v. American Comm'cns and Television, Inc.</u>, 810 F.2d 1546, 1548-49 (11th Cir. 1987).  Arbitrary and fanciful marks are inherently distinctive, and thus, protectable without a showing of secondary meaning.  <u>See</u> <u>American Television</u>, 810 F.2d at 1549. In contrast to arbitrary and fanciful marks, descriptive marks are not inherently distinctive; and thus are protectable only when the plaintiff shows that they have acquired secondary meaning.  <u>Id.</u>; <u>see</u> <u>Montgomery</u>, 168 F.3d at 1300 (explaining that if mark is not inherently distinctive, then plaintiff must prove it has "acquired distinctiveness through secondary meaning" to sustain action under section 43(a) of the Lanham Act).

As explained above, under the uniform coating numbering system adopted in 1998, each coating provided by Impreglon is assigned a corresponding alpha-numeric coating number.  According to Impreglon, these

41

numbers "have meaning and provide direction as to ingredients and processes" used in applying the particular coating.  (Id.; see also Verified Compl. ¶ 10 ("Impreglon's Marks are proprietary.  Each Mark consists of different digits and letters identifying the type of proprietary coating, such as 'TC' for TempCoat, the different coating materials, coating steps, measurement data and handling instructions associated with a specific Impreglon Process.").)  In view of this evidence, the coating numbers are, at best, descriptive—they are descriptive of the ingredients and processes used in each coating application, see, e.g., American Television, 810 F.2d at 1549 (descriptive marks identify a characteristic, quality, or function of a product or service), and appear designed less to identify Impreglon itself, and more to identify the various coatings Impreglon offers, see Arrow Fastener Co., Inc. v. Stanley Works, 59 F.3d 384, 391 (2d Cir. 1995) ("Model numbers, while often arbitrary in that they do not refer to characteristics of the item they demark, are nevertheless generally descriptive because they serve to distinguish a single source's products from each other.").  Because the coating numbers are descriptive, Impreglon must therefore establish that they have acquired distinctiveness through secondary

42

meaning to prevail on its Lanham Act claims.  E.g., American Television, 810 F.2d at 1548.

"In order to establish secondary meaning the plaintiff must show that the primary significance of the term in the minds of the consumer public is not the product but the producer."  Id. at 1549 (internal quotations omitted); Gift of Learning Foundation, Inc. v. TGC, Inc., 329 F.3d 792, 800 (11th Cir. 2003) (per curiam) ("Secondary meaning is the connection in the consumer's mind between the mark and the product's producer.").  "The Eleventh Circuit has held that a plaintiff has the burden of sustaining a high degree of proof establishing secondary meaning for a descriptive term."  Gift of Learning, 329 F.3d at 800.  Although it is not required to prove secondary meaning, this is generally accomplished through the presentation of consumer survey evidence. See id.  But where, as in this case, no consumer survey evidence has been presented, courts in the Eleventh Circuit consider four factors to determine whether a particular mark has acquired secondary meaning:

> 1) the length and manner of its use; 2) the nature and extent of advertising and promotion; 3) the efforts made by plaintiff to promote a conscious connection in the public's mind between the name and plaintiff's business; and 4) the extent to which the public

43

> actually identifies the name with plaintiff's goods and
> services.

Id.; Conagra Inc. v. Singleton, 743 F.2d 1508, 1513 (11th Cir. 1984) (same).

Whether a descriptive mark has acquired distinctiveness through secondary

meaning is a question of fact.  American Television, 810 F.2d at 1549; see also

Montgomery, 168 F.3d at 1300 (it is for trier of fact to determine whether mark

has achieved secondary meaning).

Here, Plaintiff first contends that it is not required to establish secondary

meaning, but nevertheless goes on to argue that its coating numbers have, in

fact, achieved secondary meaning.  (See Reply in Supp. of Mot. for Summ. J.  at

9-11.)  As the foregoing makes clear, Plaintiff's first argument is incorrect; in

the absence of a showing of secondary meaning, Plaintiff cannot prevail on its §

1125(a) claim.  With respect to Plaintiff's contention that it is entitled to

summary judgment because its coating numbers have indeed achieved

secondary meaning, the Court disagrees.  Neither party has adequately

addressed the four-factor test which governs this Court's secondary meaning

inquiry.  That said, the evidence submitted by Impreglon in this case is, quite

simply, insufficient to satisfy the "high degree of proof" required to establish

44

secondary meaning. Aside from Impreglon's numerous unsupported assertions that its coating numbers constitute protectable "marks" and have acquired secondary meaning, the only evidence of record on this issue appears to be the single statement by Sevki Ergun, wherein he avers that he has "come to identify Impreglon's coating numbering system with Impreglon and its coatings."[16] (Ergun Aff. [71] ¶ 5.) This single statement, however, is wholly insufficient as a matter of law to establish that Impreglon's coating numbers—which, as explained above, are at most descriptive—have acquired distinctiveness through secondary meaning. Compare Vision Center v. Opticks, Inc., 596 F.2d 111, 116 (5th Cir. 1979) (testimony of seven customers that "Vision Center" meant the plaintiff's business to them, testimony that plaintiff had occasionally received mail addressed to other establishments that had "vision" in their name, evidence that a customer of one of defendant's stores in another city believed

---

[16] Plaintiff's arguments in this respect are entirely devoid of citations to the record. (See Br. in Supp. of Mot. for Summ. J. at 13-14; Reply in Supp. of Mot. for Summ. J. at 9-10.) In fact, the only "citation" to evidence on this issue consists of a citation to "Marc's coming Affidavit." (Reply at 9.) The Court has located Mr. Ergun's statement recited above on its own and without the aid of Plaintiff. Although the Court has attempted to locate evidence in the record which might be relevant to the issue of secondary meaning, and while it is possible that there is additional evidence relevant to this issue in the record, it is not the Court's duty to comb the record in an attempt to find reasons to grant Plaintiff's Motion for Summary Judgment. See BFI Waste System of N. Am. v. Dekalb County, Ga., 303 F. Supp. 2d 1335, 1342 n.5 (N.D. Ga. 2004).

the plaintiff and defendant were associated, and recognition of plaintiff's long use of the term insufficient to establish secondary meaning).[17]  As such, Plaintiff is not entitled to summary judgment on this claim.

Plaintiff's failure to establish that its coating numbers have achieved distinctiveness through secondary meaning is similarly fatal to its claims under a "passing off" theory.[18]  Section 43(a) prohibits false designations of origin,

_____

[17] In Bonner v. City of Prichard, 661 F.2d 1206,1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to October 1, 1981.

[18] Plaintiff intermittently denominates its claim as one for "passing off" and "reverse passing off."  (See Br. in Supp. of Mot. for Summ. J. at 15-18; Reply in Supp. of Mot. for Summ. J. at 10-11.)  Passing off and reverse passing off are distinct legal theories.  Passing off occurs when one sells its own product under the mark of another; reverse passing off occurs when one sells the product of another under its own mark. Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp., 139 F.3d 1396, 1413 n.28 (11th Cir. 1998).  In this case, it appears that Plaintiff's claim is one for passing off (see Reply in Supp. of Mot. for Summ. J. at 10 (arguing that "Impreglon authorized use of the Marks on the coatings it produced, but did not authorize use of its Marks on Newco-produced coatings, nor did it give Newco any implicit or explicit authority to do so.")), and the Court construes it as such.

To the extent, however, that Plaintiff seeks to recover under a reverse passing off theory, its Motion for Summary Judgment must similarly be denied.  As the Supreme Court explained in Dastar Corp. v. Twentieth Century Fox Film Corp., "origin" in the context of § 43(a) means "the producer of the tangible product sold in the marketplace." 539 U.S. 23, 31-32, 123 S. Ct. 2041, 156 L. Ed.2d 18 (2003).  If the marks at issue are not inherently distinctive, and if they have not acquired secondary meaning, then they cannot serve to identify the "origin" or source of the product in the minds of consumers. See Wal-Mart Stores, Inc. v. Samara Brothers, Inc., 529 U.S. 205, 211-14, 120 S. Ct. 1339, 146 L. Ed. 2d 182 (2000) (holding that product design trade dress is not inherently distinctive, and that designs could not be protected under § 43(a) without showing that

46

and passing off can, in certain circumstances, constitute just that.  See Camp

Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp., 139 F.3d 1396, 1413

n.28 (11th Cir. 1998) (Section 1125(a) prohibits both "passing off" and "reverse

passing off").  But, a plaintiff may not prevail on a passing off theory where the

mark in question is merely descriptive in the absence of a showing of secondary

meaning.  See Waldman Pub. Corp. v. Landoll, Inc., 43 F.3d 775, 784 n.7 (2d

Cir. 1994) (in passing-off cases involving trademarks which are not inherently

distinctive, plaintiff must generally show that the copied features of its product

have attained a secondary meaning); Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.,

---

designs had acquired "secondary meaning" so that they "identify the source of the
product rather than the product itself").  Because a descriptive mark does not serve to
identify the producer of the product in the absence of secondary meaning, the failure to
demonstrate secondary meaning precludes liability under a reverse passing off theory.
See Dastar, 539 U.S. at 36 (explaining that the "carefully considered" secondary
meaning limitation on claims under § 43(a) "would be entirely pointless if the 'original'
producer could turn around and pursue a reverse-passing-off claim under exactly the
same provision of the Lanham Act."); see also Bretford Mfg., Inc. v. Smith Sys. Mfg.
Corp., 419 F.3d 576, 580 (7th Cir. 2005) ("Dastar added that the injury [from reverse
passing off] must be a trademark loss-which is to say, it must come from a
misrepresentation of the goods' origin.").  But see Societe Des Hotels Meridien v.
LaSalle Hotel Operating Partnership, L.P., 380 F.3d 126, 132 (2d Cir. 2004) (concluding
that plaintiff need not allege secondary meaning in reverse passing off case because the
injury suffered results from being deprived of an opportunity to build goodwill).
Accordingly, in light of the Court's conclusion that Plaintiff has failed to establish that
its coating numbers have acquired distinctiveness through achieving secondary meaning,
Plaintiff is not entitled to summary judgment on its claims under § 43(a) predicated upon
a reverse passing off theory.

781 F.2d 604, 611 (7th Cir. 1986) ("The copying of a descriptive mark that has not acquired secondary meaning does not imply passing off").  Here, as discussed above, Plaintiff has failed to demonstrate for purposes of summary judgment that its coating numbers have achieved secondary meaning.  Accordingly, it is not entitled to summary judgment on a passing off theory.

Because there is, at a minimum, a question of fact as to whether Impreglon's coating numbers have achieved secondary meaning, Impreglon has failed to establish that it is entitled to judgment as a matter of law on its claims under § 43(a) of the Lanham Act.  Accordingly, Plaintiff's Motion for Summary Judgment on these claims is **DENIED**.[19]

## B.    Georgia Unfair Trade Practices Act

As noted above, Plaintiff also brings claims based on the same conduct under the Georgia UDTPA.  As relevant to the allegations in Plaintiff's Complaint, the UDTPA provides a cause of action when a person

---

[19] Because the Court concludes that a question of fact exists as to whether Plaintiff's coating numbers have acquired secondary meaning, Plaintiff has failed to establish the first element of its claim under § 43(a) of the Lanham Act.  The Court, therefore, need not consider whether Defendants' use of the codes is likely to cause confusion.  See Boston Beer Co. Ltd. P'ship v. Slesar Bros. Brewing Co., Inc., 9 F.3d 175, 183 (1st Cir. 1993).

AO 72A
(Rev.8/82)

> in the course of his business, vocation, or occupation .
> . . (1) [p]asses off goods or services as those of
> another; (2) [c]auses likelihood of confusion or of
> misunderstanding as to the source, sponsorship,
> approval, or certification of goods or services;. . . or
> (12) [e]ngages in any other conduct which similarly
> creates a likelihood of confusion or of
> misunderstanding."

O.C.G.A. §§ 10-1-372(a)(1)-(2), -(12).  For the reasons discussed above,

however, Plaintiff's Motion for Summary Judgment on its claims under the

Georgia UDTPA must be denied.

First, § 43(a) of the Lanham Act and §§ 10-1-372(a)(2) and (12) of the

Georgia UDTPA provide analogous causes of action, and are governed by the

same standard.  Kason Industries, Inc. v. Component Hardware Group, Inc., 120

F.3d 1199, 1203 (11th Cir. 1997).  The Court has previously concluded that

Plaintiff has failed to establish that it is entitled to summary judgment on its

claims under § 43(a) of the Lanham Act because it has failed to establish that its

coating numbers have acquired distinctiveness through secondary meaning.  As

such, Plaintiff has failed to demonstrate that its coating numbers are protectable

under § 43(a).  See supra.  In light of that conclusion, Plaintiff's Motion for

Summary Judgment on its claims under O.C.G.A. §§ 10-1-372(a)(2) and (12)

must similarly be denied.  See Robert B. Vance & Associates, Inc. v. Baronet Corp., 487 F. Supp. 790, 799 (N.D. Ga. 1979) ("Since the mark . . . is merely descriptive and has not acquired a secondary meaning, the use of the term . . . has not caused a 'likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services" nor caused a "likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another . . . .' ").  Accordingly, Plaintiff's Motion for Summary Judgment on its claims under O.C.G.A. §§ 10-1-372(a)(2) and (12) is **DENIED**.

The same analysis applies to Plaintiff's claims under O.C.G.A. § 10-1-372(a)(1).  As the Court explained, passing off violates § 43(a) only if it constitutes a false designation of origin, and a descriptive mark cannot serve as a designation of origin unless it has achieved secondary meaning.  Thus, one seeking summary judgment on a passing off claim involving a descriptive mark which is not inherently distinctive must prove that the mark has achieved secondary meaning.  While the Court has found no case construing O.C.G.A. § 10-1-372(a)(1) to require such a showing, it is Plaintiff's express position that "the standard for liability under the Georgia Unfair Trade Practices Act is the

same as that for the Lanham Act." (Reply in Supp. of Mot. for Summ. J. at 13-14.)  In view of this position, as well as the Court's conclusion, <u>supra</u>, that Plaintiff has failed to demonstrate secondary meaning, Plaintiff's Motion for Summary Judgment on its claims under O.C.G.A. § 10-1-372(a)(1) are similarly **DENIED**.

### Conclusion

For the reasons stated herein, Plaintiff's Motion for Summary Judgment as to Liability for Breach of Fiduciary Duty [40] is **GRANTED**; Plaintiff's Motion for Summary Judgment on Employment Contract Restrictions on Count V of Its Complaint [41] is **DENIED**; and Plaintiff's Motion for Summary Judgment as to Liability for Violation of the Lanham Act and the Georgia Uniform Deceptive Trade Practices Act [42] is **DENIED**.  Defendant's Motions for Summary Judgment [60, 61, 62] are **DENIED**.  The parties are **DIRECTED** to file their  proposed consolidated pretrial order not later than twenty (20) days from the date this Order is entered on the docket.

51

**SO ORDERED** this  30th  day of March, 2007.


RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)